IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM v. PSYCHIATRIC SOLUTIONS, INC., et al. | : : : : | MISCELLANEOUS ACTION<br><br>No. 13-238 |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                 **January 24, 2014**

      Movant Universal Health Services, Inc. (UHS) asks this Court to quash or modify a document subpoena issued by counsel for Central States, Southeast and Southwest Areas Pension Fund (Central States), the lead plaintiff in *Garden City Employees' Retirement System v. Psychiatric Solutions, Inc.*, Civil No. 09-882 (M.D. Tenn. filed Sept. 21, 2009) (the Underlying Action), a securities class action currently pending in federal court in the Middle District of Tennessee. UHS, which is not a party to the Underlying Action, argues the subpoena is overbroad and unduly burdensome and seeks documents that are irrelevant or can be obtained from Psychiatric Solutions, Inc. (PSI), the corporate defendant in the Underlying Action. Central States urges the Court to transfer this discovery dispute to the court in which the securities class action is pending or, alternatively, to order UHS to fully comply with the subpoena within 30 days. For the reasons set forth below, the Court will grant UHS's motion and quash the subpoena.

**BACKGROUND**

      PSI operates for-profit psychiatric hospitals and residential treatment facilities, primarily for the treatment of children, adolescents, and teenagers. *See* Mot. to Quash, Ex. 3 ¶ 2. Filed on September 21, 2009, the Underlying Action is a class action brought on behalf of persons who purchased PSI securities between February 21, 2008, and February 25, 2009 (the class period), alleging securities fraud by PSI and three of its officers. Plaintiffs allege PSI "ran its business in

a manner which operated as a fraud or deceit upon investors and other members of the public," and made false and misleading statements to investors about a number of topics, including, inter alia, the quality of patient care provided by PSI.  *Id.* ¶ 3.  These allegedly false and misleading statements include a statement in PSI's 2007 annual report on Form 10-K, issued on February 28, 2008, representing that the company's "primary focus on the provision of inpatient behavioral health care services allows us to operate more efficiently and provide higher quality care than our competitors."  *Id.* ¶ 106.  Plaintiffs assert that as a result of PSI's fraud, the company's stock traded at inflated prices during the class period.  Having purchased stock at the inflated prices, plaintiffs suffered damages when the stock price dropped following the company's February 2009 announcement of a sudden decline in earnings for fiscal year 2008 due to rising malpractice claims and an investigation into conditions at several of its facilities.

In May 2010, more than two years after PSI's 2007 10-K was filed, and more than a year after the end of the class period, UHS, PSI's closest competitor during the class period, announced it would acquire PSI.[1]  The acquisition was completed in November 2010.  Approximately seven months later, in June 2011, a healthcare facilities analyst interviewed Steve Filton, UHS's Chief Financial Officer, at the Wells Fargo Securities Healthcare Conference.  In response to a request from the analyst for an update on the integration of PSI's facilities and what UHS had learned about the PSI facilities since acquiring them, Filton made the following statements:

> You know, I think we had the sense that PSI was a company focused primarily on growth.  They pursued a very aggressive growth strategy in their short eight-, nine-year history, did so very effectively.  But I think as a consequence of that, perhaps they were a little bit less focused, organized, disciplined than we were

---

[1] According to UHS, it first approached PSI about an acquisition in March 2010, approximately one year after the end of the class period.

>accustomed to seeing the UHS hospitals managed and operated in a whole host of areas, quality, risk management, operational efficiency, capital spend, et cetera.
>
>. . . .
>
>Certainly, you know, we're—improvements that can be made immediately, we're making, and again I think we've tried to prioritize, so that the changes and the improvements that affect patient safety and risk factors, we're focusing on those first, and holding, to some degree, in abeyance those that are more operational efficiencies and margin improvement, et cetera.

Mot. to Quash Ex. 5, at 1-2.

On July 30, 2013, Central States served the subpoena at issue on UHS, requesting production of "[a]ll documents that support, substantiate, formed the basis of, or relate to, [the above referenced statements by Filton]," including all documents relating to (a) "PSI's lack of 'focus[]' 'organiz[ation]' and 'discipline[]'"; (b) "PSI's 'quality, risk management, operational efficiency, capital spend'"; (c) "improvements made by UHS to PSI Facilities that affected patient quality, patient safety and risk factors"; and (d) "the prioritization of improvements to PSI Facilities."  Mot. to Quash Ex. 1, at 6-7.  On August 16, 2013, UHS objected to the subpoena on numerous grounds.  Notwithstanding its objections (and without waiving them), UHS investigated the issues raised by the subpoena and advised Central States, by letter of October 1, 2013, that Mr. Filton's statements at the June 2011 Healthcare Conference were unscripted and there were thus "no particular documents [that] 'formed the basis of' those statements."  Mot. to Quash Ex. 6.  Insofar as the subpoena called for documents that "support," "substantiate," or "relate to" Filton's statements, UHS took the position such requests were overbroad and fell outside the scope of permissible discovery.  UHS thereafter filed the instant motion, requesting this Court to quash the subpoena in its entirety or, alternatively, to deem its existing response to the subpoena adequate.

**DISCUSSION**

As an initial matter, Central States urges the Court to transfer the motion to quash to the United States District Court for the Middle District of Tennessee, where the Underlying Action is pending. Although the version of Federal Rule of Civil Procedure 45 in effect when UHS filed the instant motion to quash did not explicitly authorize the transfer of a subpoena-related motion, a number of courts had held such a transfer was permissible in limited circumstances, particularly where the nonparty consented to the transfer. *See, e.g.*, *Frank Brunckhorst Co. v. Ihm*, No. 12-217, 2012 WL 4963757, at *5 (E.D. Pa. Oct. 18, 2012) (collecting cases). *But see, e.g.*, *In re Sealed Case*, 141 F.3d 337, 343 (D.C. Cir. 1998) (vacating on mandamus review the transfer of subpoena-related motions to the court where the underlying action was pending and holding the Rules of Civil Procedure do not authorize a district court to transfer such motions).

After the instant motion to quash was filed, the 2013 amendments to Rule 45 took effect, adding new Rule 45(f), which expressly authorizes the transfer of a subpoena-related motion, providing "[w]hen the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances."[2] Fed. R. Civ. P. 45(f). In its order adopting the 2013 amendments to Rule 45, the Supreme Court specified the amendments would govern in all proceedings commenced after December 1, 2013, and, "insofar as just and practicable, all proceedings then pending." Central States' Surreply Attachment, ECF No. 20-1, at 4. While the parties continue to disagree as to whether transfer of UHS's motion to quash is warranted, they have not identified any reason why evaluating Central States' request to transfer

---

[2] In contrast to former Rule 45, under which a subpoena for production issued from the court for the district in which the production was to be made, the amended Rule provides "[a] subpoena must issue from the court where the action is pending." Fed. R. Civ. P. 45(a)(2).

4

under Rule 45(f) would be unjust or impracticable; hence, the Court will evaluate the request under the new Rule.

As noted, where, as here, a person subject to a subpoena opposes transfer of a subpoena-related motion, a court may transfer the motion only in exceptional circumstances. Fed. R. Civ. P. 45(f). "[T]he proponent of transfer bears the burden of showing that such circumstances are present." Fed. R. Civ. P. 45(f), advisory committee notes (2013 amendments). The Advisory Committee Notes provide the following guidance as to when transfer of a subpoena-related motion is appropriate:

> The prime concern should be avoiding burdens on local nonparties subject to subpoenas, and it should not be assumed that the issuing court is in a superior position to resolve subpoena-related motions. In some circumstances, however, transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when the court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts. Transfer is appropriate only if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion.

*Id.* Applying this standard, the Court is not persuaded transfer is appropriate here. Although UHS now owns PSI, UHS is not a party to the Underlying Action and is represented by separate counsel. Because both UHS and its counsel are located in this judicial district, it would be more burdensome for UHS to litigate the instant motion in Tennessee than in this district. While the district court in Tennessee undeniably has greater familiarity with the Underlying Action and plaintiffs' theory of liability, Central States has not shown the Tennessee court has ruled on discovery issues similar to the issues raised by the instant motion or that the issues presented are

likely to recur.[3] Because Central States has not shown exceptional circumstances warranting transfer of UHS's motion to quash are present, the Court will deny the request to transfer.

As to the merits of the parties' dispute, "[a] subpoena under Rule 45 must fall within the scope of proper discovery under [Federal Rule of Civil Procedure 26(b)(1)]." *First Sealord Sur. v. Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 382 (E.D. Pa. 2013) (citation and internal quotation marks omitted). Rule 26(b)(1), in turn, permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense." Information need not be admissible to be relevant; the discovery need only be "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Although the standard for relevance under Rule 26(b)(1) is liberal, the Rule does not authorize a party to "simply engage in a fishing expedition." *Essex Ins. Co. v. RMJC, Inc.*, No. 01-4049, 2008 WL 2757862, at *2 (E.D. Pa. July 16, 2008).

Under Rule 45(d)(3)(A) (formerly Rule 45(c)(3)(A)), a court must quash a subpoena if it subjects the recipient to "undue burden." Whether a subpoena poses an undue burden turns on a number of factors, including (1) relevance, (2) the party's need for the documents, (3) the breadth of the request, (4) the time period covered by the request, (5) the particularity with which the documents are described, (6) the burden imposed, and (7) the recipient's status as a nonparty. *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, No. 07-133, 2008 WL 597711, at *2 (E.D. Pa. Mar. 4, 2008). "[E]ven if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused

---

[3] Although Central States notes the Tennessee court has been closely overseeing discovery disputes that have arisen in the Underlying Action, it does not identify any disputes similar to the one before this Court. Rather, the examples of discovery disputes identified in Central States' papers involve PSI's request for leave to conduct discovery of absent class members and the parties' stipulation resolving PSI's objection to certain of Central States' document requests as unduly burdensome.

by production outweighs the benefit." *First Sealord Sur.*, 918 F. Supp. 2d at 383 (citation and internal quotation marks omitted).

      The parties vigorously dispute whether the documents Central States seeks are relevant to the claims in the Underlying Action.  As noted, the subpoena calls for production of "[a]ll documents that support, substantiate, . . . or relate to" remarks made by UHS CFO Steve Filton in June 2011 regarding the integration of PSI's facilities in the first seven months following PSI's acquisition by UHS.[4]  Mot. to Quash Ex. 1, at 6-7.  In particular, the subpoena calls for production of documents supporting, substantiating, or relating to Filton's statements that, in his view, (1) PSI was "perhaps . . . a little bit less focused, organized, disciplined" than UHS with respect to "quality, risk management, operational efficiency, capital spend, et cetera," and (2) in making changes and improvements to PSI facilities, UHS was prioritizing changes and improvements "that affect patient quality and patient safety and risk factors" over "those that are more operational efficiencies and margin improvement, et cetera." *Id.*

      Central States argues the requested documents are relevant to the claims in the Underlying Action because Filton's statements support plaintiffs' contention that PSI made false and misleading statements regarding the company's quality of care relative to its competitors during the class period.  Specifically, Central States contends Filton's remarks demonstrate that at least one of the allegedly false and misleading statements identified in the Consolidated Complaint—PSI's statement in its 2007 10-K that the company "believes that our primary focus

---

[4] Although the subpoena also calls for production of documents that "formed the basis for" Filton's statements, Mot. to Quash Ex. 1, at 6, after investigation, UHS determined the remarks were unscripted and there were thus no documents that formed the basis of the statements.  In support of its motion to quash, UHS has submitted a declaration from Mr. Filton to this effect. *See* Mot. to Quash, Ex. 7 ¶ 4 (confirming that remarks at the Wells Fargo Securities Healthcare Conference were unscripted and that Filton does not have and is not aware of any documents that formed the basis for such statements).

on the provision of inpatient behavioral health care services allows us to operate more efficiently and provide higher quality care than our competitors," Mot. to Quash Ex. 3 ¶ 106—was, in fact, false.  Central States infers from Filton's remarks that "UHS has documents in its possession that *contradict these very statements*, and support plaintiffs' claims that, in fact, PSI's facilities were not superior to their competitors, and were in need of immediate intervention just to ensure basic patient safety."  Opp'n to Mot. to Quash 10.

UHS argues the requested documents are not relevant because Filton made the remarks on which the subpoena is based more than two years after the end of the class period and the remarks at most reflect Filton's hindsight perspective on UHS's acquisition of PSI in November 2010.  UHS maintains Filton's statements, which were based on information learned in the seven months following the acquisition, "suggest[] nothing about PSI during the February 2008 through February 2009 time period relevant to the Underlying Litigation."  Mot. to Quash 9.

Preliminarily, the Court notes Filton's vague opinions about PSI's lesser degree of focus and discipline provide limited support for the proposition that UHS believed PSI's quality of care was inferior.  *See* Mot. to Quash Ex. 5, at 1 (opining that "*perhaps*" PSI was "a *little bit less* focused, organized, disciplined" than UHS in various areas (emphasis added)).  Nevertheless, even assuming Filton's remarks reflect his opinion that PSI's facilities "were in need of immediate intervention just to ensure basic patient safety," Opp'n to Mot. to Quash 10, the Court agrees with UHS that the remarks are too remote in time from the class period (and from the 10-K statement they allegedly contradict) to be relevant to the claims in the Underlying Action.

The Court recognizes that discovery in a securities class action is not necessarily confined to the class period, as information generated earlier or later may shed light on allegations of fraud during the class period, particularly on the issue of the defendant's

8

fraudulent intent.  *See, e.g.*, *In re Seagate Tech. II Sec. Litig.*, No. 89-2493, 1993 WL 293008, at *2 (N.D. Cal. June 10, 1993) (recognizing the class period "does not determine the period of relevancy for discovery purposes," especially as to "the issue of scienter, intent, and knowledge" (citation and internal quotation marks omitted)).  The extent to which discovery may extend beyond the class period, however, depends on the facts of the particular case.  *Compare, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 91-92 (2d Cir. 2000) (holding a securities fraud defendant's filing of a complaint against a third party thirteen months after the class period was relevant to what the defendant knew during the class period where the complaint alleged the third party breached its contract with defendant during the class period), *and Seagate*, 1993 WL 293008, at *1-2 (allowing document discovery from nonparty investment banking firms to extend four months beyond the class period where the subpoenaed documents—analyst and research reports regarding the defendant and documents relating to the valuation of the defendant's securities— pertained to the core issues in the case), *with In re Subpoena Duces Tecum Served on Duke Energy Corp.*, No. 05-201, 2005 WL 2674938, at *6 (W.D.N.C. Oct. 18, 2005) (limiting a third-party subpoena to documents regarding the third party's interactions with defendant during the relevant time period where the central issue in the case was what the defendant knew when it made the alleged misstatements).

      Here, Central States' subpoena is based on remarks Filton made more than two years after the end of the class period and more than three years after the statement plaintiffs contend the remarks contradict.  Moreover, Filton made the remarks at issue in response to a question about what UHS had "learned incrementally about the PSI facilities since you have owned them," i.e., since the acquisition was completed in November 2010.  Mot. to Quash Ex. 5, at 1.  At most, Filton's remarks reflect UHS's opinions about the PSI facilities around the time of the

9

acquisition and thereafter. Such opinions are not reasonably calculated to lead to the discovery of admissible evidence regarding the quality of care at PSI's facilities in February 2008, when PSI filed its 2007 10-K.

Although the basis for the subpoena is Filton's remarks seven months after UHS's acquisition of PSI, at oral argument, Central States took the position it is primarily seeking evaluations or comparative analyses of PSI's facilities generated by UHS as part of its due diligence with respect to the acquisition. As noted, however, UHS did not approach PSI about a potential acquisition until March 2010, a year after the end of the class period, and the acquisition was not completed until eight months later in November 2010. Even assuming the type of comparative analysis PSI seeks exists, there is no basis to believe an analysis generated in mid-2010 would reflect UHS's opinion regarding the relative quality of care at PSI's facilities in February 2008, when the allegedly false statement about PSI's quality of care was made. Given the tenuous connection between UHS's opinions regarding PSI's quality of care in 2010 and beyond and the actual quality of care at PSI's facilities two years earlier, the Court finds the subpoenaed documents are not relevant to Central States' claims in the Underlying Action.

Because Central States has not established the documents it seeks are relevant to its claims, a threshold requirement to obtain discovery, the Court need not consider the remaining factors regarding undue burden. *See, e.g.*, *Essex Ins. Co.*, 2008 WL 2757862, at *2 (quashing subpoena as to nonparties without considering privilege arguments based on the lack of "any support in the record to demonstrate relevance"). Accordingly, for the reasons set forth above, UHS's motion to quash will be granted.

An appropriate order follows.

BY THE COURT:


   /s/ Juan R. Sánchez
Juan R. Sánchez, J.